UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARIE HAWKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:04-cv-0378-DFH-WTL |
| | ) | |
| GEORGE F. CRAM CO., | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant George F. Cram Co. ("Cram") manufactures maps and globes at a production facility in Indianapolis, Indiana. Plaintiff Marie Hawkins worked as a production worker for defendant Cram at the Indianapolis facility from 1979 until Cram terminated her employment in 2003. Hawkins claims Cram dismissed her because of her age in violation of the Age Discrimination and Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and because it perceived her as disabled in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*[1] Cram claims that it fired Hawkins because the company needed to reduce the size of its workforce and needed to retain only those employees able to "multitask" and

---

[1]Hawkins' complaint alleged that Cram discriminated against her because of her disability or, alternatively, because Cram regarded her as having a disability as defined by the ADA. Cplt. ¶¶ 18-20; See 42 U.S.C. § 12102(2). For the purpose of summary judgment, Hawkins has acknowledged that there is insufficient evidence to support a claim that she has an actual disability within the meaning of the ADA. She contends now only that Cram regarded her as having a disability, so that she is protected by the ADA. Pl. Br. at 2, n.1.

to work in different departments.  Def. Br. at 4.[2]  Cram has filed a motion for summary judgment on both of Hawkins' claims.  As explained below, genuine issues of material fact require denial of Cram's motion for summary judgment as to both the age and disability discrimination claims.

### Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment should be granted only where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Only genuine disputes over material facts can prevent a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  *Id.*

When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party.  See Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255; *Baron v. City*

---

[2]Cram representatives also referred to the ability to perform multiple tasks as "cross-training."  Thomas Dep. at 10.

*of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). "[B]ecause summary judgment is not a paper trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The court's only task is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.*

### Undisputed Facts

The following facts are either undisputed or reflect the evidence in the light reasonably most favorable to plaintiff Hawkins. Cram employed Hawkins as a production worker from July 25, 1979 until her dismissal on May 16, 2003. While employed by Cram, Hawkins worked in several departments. On September 7, 1992, she suffered a work-related injury to her right arm, wrist, hand, and thumb. Despite treatment with surgery, medication, and therapy, Dr. Lewis Kinkead, M.D. reported in 1995 that Hawkins had a permanent 29 percent impairment to her right hand. Pl. Dep. at 55, 57, 58, 188, 189, 190; Pl. Dep. Ex 17.

Since her injury in 1992, Hawkins has experienced the following symptoms: weakness in her right arm, wrist, hand, and thumb; numbness in the fingertips of her right hand; pain in her right wrist and arm caused by gripping items with her hand or straightening her arm for extended periods; soreness in her right wrist; cramping in her right hand; pain caused by a bump on her right hand; and periodic tingling in her right hand. Pl. Dep. at 55-61, 63, 64, 83. Hawkins is

normally able to dress herself, to brush her teeth, and to provide for her own basic care.  *Id.* at 71-72.  She experiences difficulty performing many daily household activities, such as holding drinking glasses, removing items from cabinets, peeling potatoes, opening jars, lifting more than fifteen pounds with her right hand, sewing, tying her shoes, washing in the shower, mopping, cleaning her bathroom, gardening, writing, vacuuming, holding a newspaper, using scissors, and curling her hair.  *Id.* at 58-74.  Hawkins uses her left hand to perform some activities, such as buttoning clothes, and sometimes uses tools to assist her in performing tasks that are affected by her impairment.  *Id.* at 59, 67, 72.

Hawkins admits that her impairment has limited her ability to perform some of the tasks performed by Cram employees in various departments.  *Id.* at 233-48.  Hawkins testified that as of May 2003, she could not perform the Map Department tasks of packing and stick mounting, and she doubted that she could perform the tasks of wire taping and assembly.  *Id.* at 241-42.  She also testified that she could not perform some of the tasks performed by employees in the Fiberboard Globe Department ("FBG Department").  *Id.* at 231-36.

For the two years preceding Hawkins' dismissal, she worked in the Plastic Globe Department with co-workers Stephanie Hardy and Mary Lou Covington.  Hawkins' supervisor in this department was Etta Kirby.  *Id.* at 18.  At the time of Hawkins' dismissal in May 2003, Hawkins was 67 years old; Covington was 62

years old; supervisor Kirby was 62 years old; and Hardy was 40 years old.  Kirby Aff. ¶ 9; Janowiecki Aff. ¶¶ 6, 7; Janowiecki Aff. Exs. 1, 2.

Cram claims that in 2003, management sought to "deal with the cyclical nature of the business by downsizing the workforce" to a "core group of employees who had a high level of abilities to work in different areas and to multitask."  Def. Br. at 4.  Toward this goal, management ordered department heads to determine which employees would be retained based on (1) ability to perform multiple tasks; (2) productivity, including an assessment of job performance and attendance; and (3) employee seniority.  Thomas Dep. at 10-13, 28; Thomas Dep. Ex 1.  Supervisor Kirby prepared a "Cross Training Matrix" for the Plastic Globe Department indicating that Hawkins could not perform all of the tasks of the department. Kirby Aff. Ex. 1.  Jeff Eubanks was the manager of the FBG Department (and Hawkins' son-in-law).  He prepared an "FBG Employee Cross Training Sheet" showing the department tasks that each employee had been trained to perform. The FBG Cross Training Sheet states that no employee in the FBG Department was considered "trained" in every task.  Eubanks Dep. at 19-20; Eubanks Dep. Ex. 5.

Cram management then held a meeting with the department heads to discuss their recommendations and to determine whether any employees on the termination lists prepared by the department heads should be retained.  Thomas Dep. at 11-12, 59-60.  Kirby recommended that Cram terminate Hawkins and

Hardy, and retain Covington, who had the most seniority of the three employees in her department.  Kirby Aff. ¶ 7; Janowiecki Aff. Ex. 2.  During the meeting some employees were removed from the termination lists and some were added.  Eubanks Dep. at 18; Thomas Dep. at 25-27.

None of the supervisors present requested during the meeting that Hawkins be transferred to their departments.  Eubanks Dep. at 23.  After the meeting, however, plaintiff's son-in-law Eubanks suggested to Art Thomas, Cram's manufacturing manager, that Hawkins be transferred to the FBG Department in exchange for another employee.  Def. Br. at 6; Thomas Dep. at 18-19.  Eubanks testified that in his conversation with Thomas, he suggested that Hawkins replace Lavonne Menardo.  Eubanks Dep. at 24-25.  Hawkins was not transferred.  Instead, Cram terminated her employment on May 16, 2003.  Eleven other employees, whose ages ranged from 20 to 56, were terminated at the same time.  Janowiecki Aff. Ex. 1.  Hawkins testified that since the loss of her job at Cram, she has applied for or inquired about open positions at several local businesses.  Pl. Dep. at 47-49.

Hawkins testified that when she asked Rob Parsons, plant manager, about losing her job, he told her that Cram was going to keep people on who were "better qualified" in that they could do "everything."  *Id.* at 126.  Hawkins does not dispute that at the time of her dismissal in May 2003, she could not perform all of the tasks performed by all of the employees in any department of the

Indianapolis facility.   *Id.* at 248.   Since Cram's downsizing, company representatives report that employees are assigned to departments in the plant as necessary, and that Cram hires temporary employees when additional workers are needed.  Thomas Dep. at 35-39, 42-43, 46; Thomas Dep. Ex. 5.  Additional facts are included where relevant to the discussion below, keeping in mind the standard that applies on summary judgment.

*Discussion*

I.   *Age Discrimination*

Hawkins claims that Cram terminated her because of her age in violation of the ADEA, 29 U.S.C. § 621 *et seq.*  Hawkins presents no direct evidence of discrimination based on her age.  She seeks to establish such discrimination with indirect evidence under the burden-shifting framework adapted from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

To defeat summary judgment by using the indirect method of proof, the plaintiff first must come forward with evidence that would allow a jury to find the elements of a prima facie case of discrimination.  If the plaintiff meets this burden, the defendant may rebut the plaintiff's prima facie case by articulating a legitimate, non-discriminatory reason for the employment action.  The plaintiff must then present evidence that could allow a reasonable jury to find that the stated reason was not a true reason, but a pretext, which may permit in turn an

inference of unlawful intent.  *Fisher v. Wayne Dalton Corp.*, 139 F.3d 1137, 1141 (7th Cir. 1998) (applying indirect method of proof to age discrimination claim).

### A.   *Hawkins' Prima Facie Case*

To show a prima facie case of age discrimination, a plaintiff asserting an ADEA claim arising from a reduction in force ("RIF") must demonstrate that (1) she is in the protected class of persons 40 or older; (2) her performance met the employer's legitimate expectations; (3) she was subjected to an adverse employment action; and (4) "similarly situated and substantially younger employees were treated more favorably."  *Fisher*, 139 F.3d at 1141; *Peele v. Country Mutual Insurance Co.*, 288 F.3d 319, 326 (7th Cir. 2002).

Cram does not dispute that Hawkins satisfies the first three elements:  at age 67, she was a member of the protected class; she was performing to Cram's legitimate expectations before the downsizing; and she was subject to the adverse employment action of termination.  Cram argues, however, that Hawkins has not satisfied the fourth element because she is unable to demonstrate that similarly situated and substantially younger employees were treated more favorably.  Def. Br. at 22.

To be considered "substantially younger" under the fourth element of the prima facie case, another employee must ordinarily be at least ten years younger than the plaintiff.  *Kariotis v. Navistar International Transportation Corp.*, 131 F.3d

672, 676 n.1 (7th Cir. 1997) (age difference of less than ten years is presumed to be insubstantial); *Fisher*, 139 F.3d at 1141 (same).  Cram asserts that the only similarly situated employee who was treated more favorably by being retained despite the downsizing was Covington.  Of the three employees who worked under Kirby in the Plastic Globe Department, only Covington was retained after the downsizing.  Covington is only five years younger and thus is not "substantially younger" than Hawkins.  If Covington were the only employee situated similarly to Hawkins, Hawkins would be unable to satisfy the fourth element of the prima facie case of age discrimination.

Hawkins claims that three employees who are more than ten years younger than she were both situated similarly and retained despite the downsizing: Lavonne Menardo, Kristina Kurti, and Roger Brown.  Pl. Br. 12-13.  Cram argues that these employees, despite being substantially younger than Hawkins, were not situated similarly to her.  Cram suggests that case law requires that comparison employees work in the "same department and report to the same supervisor." Def. Reply Br. at 7.  The cases cited by Cram list working in the plaintiff's department as one factor supporting similarity; they do not hold that such evidence is always required as a matter of law for a valid comparison.  See *Auston v. Schubnell*, 116 F.3d 251, 254 (7th Cir. 1997); *Pulliam v. General Motors*, 354 F. Supp. 2d 874, 882 (W.D. Wis. 2005).  Though the Seventh Circuit generally requires a showing that the action at issue was made by a common decision-maker, a "valid comparison" in a RIF case will demonstrate that the comparison "employees

encountered a RIF, that they obtained positions for which [the plaintiff] was qualified, and that the supervisors in charge also knew that [the plaintiff] was looking for such positions." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618-19 (7th Cir. 2000) (also stating, "In determining whether two employees are similarly situated a court must look at all relevant factors, the number of which depends on the context of the case.").

In this case, the comparison cannot be limited to the three workers in the plastic globe department, at least as a matter of law. The evidence would easily support a finding that lay-off decisions were made on a company-wide basis, only after management undertook comparisons among departments. After Thomas directed the department supervisors to complete termination lists, Thomas, Parsons, Karen Janowiecki, Cram's Human Resource Manager, and each of the department supervisors all met together to discuss the supervisors' recommendations and to determine collectively if any employees listed would be retained. Thomas Dep. at 59-60. All of those present at the meeting agreed upon the list of employees who would be laid off. *Id.* at 60. Hawkins spoke with both Parsons and Thomas about retaining her position or being transferred to another department, but neither changed the company's decision to terminate Hawkins' employment. Pl. Dep. at 126-27, 200. Construing the facts in the light most favorable to Hawkins, though Menardo, Kurti, and Brown did not work in Hawkins' department and were not directly supervised by Kirby, the decision to retain them and to terminate Hawkins was made by the same management team,

of whom at least several were aware that Hawkins wanted to continue working for the company.

Cram also argues that Menardo, Kurti, and Brown were not situated similarly to Hawkins because they did not possess similar abilities. When determining whether employees are situated similarly to the plaintiff, the court must examine "all relevant factors," which may vary depending on the circumstances of the case. *Radue*, 219 F.3d at 617. Comparison employees need not be identical to the plaintiff, but must be similar to the plaintiff "in all material respects." *Greer v. Board of Education*, 267 F.3d 723, 728 (7th Cir. 2001); *Radue*, 219 F.3d at 618. In RIF cases, plaintiffs have been "required to show at a minimum that the retained or transferred younger employees possessed analogous attributes, experience, education, and qualifications relevant to the positions sought." *Id.*

Hawkins argues that, given Cram's stated reason for Hawkins' dismissal as the retention of a "core group of employees who had a high level of abilities to work in different areas and to multitask," Def. Br. at 4, those retained in such a group should serve as similarly situated comparators. She points specifically to Menardo, Kurti, and Brown. Pl. Br. at 11-13. Cram argues that because these three employees had no physical limitations preventing them from multitasking, they were not similarly situated for purposes of age discrimination analysis. Def. Reply Br. at 8-12.

Lavonne Menardo was 49 years old, had been employed by Cram for seven years, and was working in the FBG Department at the time of Cram's 2003 downsizing.  Thomas Dep. Ex. 4.  Eubanks' "FBG Employee Cross Training Sheet" dated May 15, 2003 includes a chart with the names of employees and the tasks they were trained to perform in the department.  Eubanks Dep. Ex. 5.  The chart shows that Menardo was trained in taping and packing, but not in die cutting, scrapping, trimming, forming, joining, or assembling.  *Id.*  Eubanks testified that where the chart showed that an employee was not trained in a task, it meant that "they weren't trained to the point that they could run the job themselves." Eubanks Dep. at 40.  Eubanks testified that none of the employees on the list were unable to perform the tasks because of a physical impairment.  *Id.* at 41.  He also testified:

> We have tried Lavonne [Menardo] in assembly, and she wasn't able. She just wasn't very good at it.  People have strengths and weaknesses, and so you work to strengths and away from your weaknesses.  Everybody hasn't been able to do every job we give them.

*Id.* at 40-41.[3]  When asked if he could think of additional examples of having trained employees on department tasks and having experienced similar results, Eubanks also testified that he had "tried [Lavonne] at joining."  *Id.* at 45.  When asked what tasks Menardo could perform in addition to the taping and packing indicated on Eubanks' cross training sheet, Thomas was unaware of any

---

[3]It is unclear from the record whether the name is spelled "Minardo" or "Menardo."  The court has simply chosen one spelling here.

additional tasks.  Thomas Dep. at 29-30.  Hawkins "can perform taping, packing, trimming, die cutting, and assembling."  Def. Br. at 3.  Thomas testified that Eubanks, supervisor of the FBG Department, asked Thomas if the company would transfer Hawkins to his department to perform taping.  Thomas Dep. at 18-20. Eubanks testified that in this conversation, he suggested that Hawkins take Menardo's position.  Eubanks Dep. at 24.

Construing the facts in a light reasonably most favorable to Hawkins, as the court must on Cram's motion for summary judgment, Hawkins has demonstrated a genuine issue of fact as to whether Menardo was a similarly situated and substantially younger employee treated more favorably than Hawkins.  Cram argues that Hawkins and Menardo were not similarly situated because, though Menardo was not considered "trained" on the additional tasks, she had the physical ability to perform them.  Def. Reply Br. at 9-10.  The significance of such a difference is not apparent, however, when one considers that, despite being physically able and having tried to perform at least one task in her department, Menardo was not able to perform the task, and where it is unclear whether Cram management had any knowledge as to Menardo's ability to perform tasks in other departments.  Eubanks Dep. at 40-41; see also Thomas Dep. at 29.  Though there are differences between Menardo and Hawkins, they need not be identical in all aspects in order to be *similarly* situated.  *Radue*, 219 F.3d at 618.  Based on the tasks that Cram acknowledges both Hawkins and Menardo were able to perform, their respective experience, the age difference between them, and the

circumstances surrounding Hawkins' loss of employment and Menardo's retention, a reasonable juror could find that Hawkins and Menardo were sufficiently similar to satisfy the fourth element with Menardo as a comparator.

Krista Kurti was 25 years old, had been employed by Cram for six years, and was also working in the FBG Department at the time of Cram's 2003 downsizing. Thomas Dep. Ex. 4. Eubanks' cross training sheet indicates that at the time of Cram's 2003 downsizing, Kurti had been trained, meaning that she was able to perform independently, the tasks of taping, assembling, and packing. Eubanks Dep. at 40; Eubanks Dep. Ex. 5. As mentioned earlier, Hawkins was able to perform such tasks, as well as die cutting and trimming. Def. Br. at 3. When asked whether there were tasks in the FBG Department that some of the retained employees could not perform, Eubanks testified as follows:

> Q.   Can you think of any other examples at this time where you tried to train an employee on a task like with Lavonne Menardo, but it just didn't work out?
>
> A.   Well, Lavonne, we tried her in joining. We tried Krista [Kurti] in joining. . . . We try a lot of people in joining. Joining is, in my opinion, the hardest thing we do at Cram.

Eubanks Dep. at 45; see also Def. Reply Br. at 9 n.6. Cram's articulated purpose was to have a core group who could work in different departments day to day. Kurti was not able at the time of downsizing to perform all such tasks on her own, so she could be considered similar to Hawkins in relevant ways.

Roger Brown was 52 years old and had been employed by Cram for just six months at the time of the 2003 downsizing.  Thomas Dep. Ex. 4.  Though Eubanks placed Brown on the initial termination list for his department, Eubanks testified that those present at the management team meeting decided that Brown would be retained and moved to packing because Brown could perform metal spinning, and "it was easier to train a packer" than a metal spinner.  Eubanks Dep. at 18-19; see Def. Br. at 5.  A "Mountings Cross Training Chart" dated May 15, 2003 indicates that Brown had been trained only to load and unload powder coating, but was in training for all other machine shop and metal spinning tasks in the department.  Hawkins Aff. Ex. A.[4]  Brown was not trained to perform a wide range of tasks at the time of the 2003 downsizing, but he was then being trained for all of the other tasks in his department.  *Id.*  Because Brown was recently hired and had apparently not yet completed his training process, he was not situated similarly to Hawkins.

Drawing all reasonable inferences in favor of Hawkins, and considering the relevant factors under the circumstances, Hawkins has raised a genuine issue of fact as to whether she was treated less favorably than similarly situated

---

[4]Cram has objected to the admissibility of the "Mountings Cross Training Chart."  The chart was produced by Cram in discovery, and on its face appears to have been generated by Cram management.  With that evidence of authenticity, it would appear to be admissible for present purposes against Cram.  See Fed. R. Evid. 801(d)(2).  However, the court has not relied on such evidence in any ruling on Cram's motion.

employees, satisfying the contested fourth element of her prima facie case of age discrimination.

B.     *Hawkins' Showing of Pretext*

If a plaintiff can establish a prima facie case of age discrimination, a "rebuttable presumption of discrimination" arises, shifting the burden "to the employer to articulate a legitimate, nondiscriminatory reason" for its actions. *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).  If the employer meets this burden, the presumption disappears.  To avoid summary judgment, plaintiff must then present evidence that could enable a trier of fact to find that the reason put forth was deliberately false.  *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002).  The plaintiff can meet this burden indirectly by showing that the stated reason was either (1) factually baseless; (2) not the true reason for the action; or (3) insufficient to justify the action.  *Johnson*, 91 F.3d at 931.

Cram claims that the most important factor used to determine which employees would be terminated in the May 2003 reduction in force was an employee's "ability to perform multiple tasks," Def. Br. at 24, and to work in a variety of departments.   Def. Br. at 15; Janowiecki Aff. ¶ 8. Though Kirby determined that Hawkins was unable to perform all of the tasks in her department, the cross-training lists produced by Eubanks and Kirby show that Hawkins could, at the time of the 2003 downsizing, perform more tasks than some

younger employees with less seniority who were retained.   Kirby Aff. Ex. 1; Eubanks Dep. Ex. 5.  Left unclear by the evidence submitted by the parties is the extent to which the management team actually considered whether employees could work in different areas of the facility, which Cram claims to consider a key skill.  See Thomas Dep. at 12, 29; see also *Appelbaum v. Milwaukee Metropolitan Sewerage Dist.*, 340 F.3d 573, 580-81 (7th Cir. 2003) (affirming jury verdict in favor of plaintiff where employer's inconsistent application of its policy that employees be terminated for breaching confidentiality was sufficient to raise an inference of pretext).

Evidence of Kirby's comments to Hawkins casts further doubt on Cram's actual reason for terminating Hawkins.  Hawkins testified that Kirby "sometimes" commented that she "didn't know why [Hawkins] was still working," and that Kirby told Hawkins that she would quit if she were Hawkins' age.  Pl. Dep. at 120. As a department supervisor, Kirby's duty was to generate a termination list for her department and to discuss her recommendations at the management meeting at which the termination decisions were made.  See Kirby Aff. ¶¶ 2-4.  Kirby alone evaluated the ability levels of the employees in her department.  *Id.* ¶¶ 4-6.  Kirby recommended that Hawkins be terminated at the management meeting.  *Id.* ¶ 7.

Cram's attempts to explain away Kirby's statements, which relate directly to Hawkins' age and her employment, are not persuasive, at least as a matter of law.  Cram contends that such comments would likely not be considered sufficient

by themselves to constitute direct evidence of age discrimination.  See *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1063 (7th Cir. 2003)  (affirming summary judgment where age-related comments were not sufficient to establish direct evidence that discrimination motivated the employment decision at issue); see also *Robin v. Espo Engineering Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000) (affirming summary judgment where age-related comments occurred more than two years before the adverse employment action).  Cram also cites case law demonstrating that employer comments pertaining to retirement are not sufficient to demonstrate age discrimination.  See, *e.g.*, *Halloway v. Milwaukee County*, 180 F.3d 820, 825 (7th Cir. 1999).  Yet Kirby's statements related specifically to Hawkins' age, not only to retirement.  Cram also cites cases stating that age-related comments that do not pertain to employment, *Schaffner v. Glencoe Park District*, 256 F.3d 616, 623 (7th Cir. 2001), or that are neither about nor directed to the plaintiff do not *alone* establish pretext.  See *O'Connor v. DePaul University*, 123 F.3d 665, 671-72 (7th Cir. 1997) (finding age-related comments made about different employees were alone insufficient to establish pretext where plaintiff was dismissed for writing harassing letters to a co-worker).  Kirby's comments, however, related specifically to both Hawkins' age and employment, and they are not the only evidence of discrimination.

Comments that are insufficient on their own to establish direct evidence of discrimination may still be "probative of discriminatory bias when assessing whether an employer's reasons for an adverse employment action are pretextual."

-18-

*Huff v. UARCO, Inc.*, 122 F.3d 374, 385 (7th Cir. 1997) (reversing summary judgment in favor of employer on ADEA claim).  Even statements unrelated to employment can support an inference of discrimination when considered in the specific circumstances of the case.  *Id.*  Kirby's alleged statements pertaining to Hawkins' age and employment are relevant to pretext.  Kirby was Hawkins' only direct supervisor.  She evaluated Hawkins' ability, reported that information to Cram management, recommended her termination, and took part in the meeting at which final termination decisions were made.  Kirby was sufficiently involved in the final decision that age-based animus on her part can be attributed to the employer.  See *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997) ("there can be situations in which the forbidden motive of a subordinate employee can be imputed to the employer because, under the circumstances of the case, the employer simply acted as the 'cat's paw' of the subordinate"), citing *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990).

The issue here is not whether Hawkins will ultimately prove her case.  At this summary judgment stage, the court must give Hawkins the benefit of all conflicts in the evidence and all reasonable inferences in her favor.  Though the standard for summary judgment remains the same in employment discrimination actions, such actions nonetheless "typically involve questions of intent and credibility" that are commonly not suited to summary judgment.  *Alexander v. Wisconsin Dep't of Health and Family Services*, 263 F.3d 673, 681 (7th Cir. 2001) (explaining court's previous repeated comments that the summary judgment

standard is applied with "added rigor" in employment discrimination cases). Viewing the evidence in a light reasonably most favorable to Hawkins, there exists a genuine issue of fact as to whether Cram's proffered reason for Hawkins' termination, the creation of a core multitasking workforce, is pretextual. The claim must be resolved by a trial rather than on summary judgment.

II.     *Disability Discrimination*

Hawkins also claims that Cram discriminated against her because of what Cram perceived to be her disability. The Americans with Disabilities Act prohibits an employer from subjecting a qualified individual with a disability to disparate treatment based on the individual's actual or perceived disability. 42 U.S.C. § 12112(a) & (b)(4); *Wiegel v. Target Stores*, 122 F.3d 461, 463-64 (7th Cir. 1997).[5] To prove that Cram discriminated against her because of disability, Hawkins must show (1) that she has a disability as defined in the ADA, (2) that she was "qualified to perform the essential functions" of her position either with or without reasonable accommodation, and (3) that she "suffered from an adverse employment action because of [her] disability." *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001); *Wiegel*, 122 F.3d at 465.

---

[5]The ADA also prohibits an employer from failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). Hawkins has not argued that Cram failed to provide her with a reasonable accommodation, but only that it fired her because it regarded her as disabled.

A.     *Regarded as Disabled*

The ADA defines "disability" as  "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).   Under the third test, a person may be protected under the ADA if she is "regarded as" having a physical or mental impairment that substantially limits one or more of the major life activities of the person.  *Id.*  Because Hawkins advances a "regarded as" claim of disability, she must demonstrate that Cram regarded her impairment as substantially limiting one or more major life activities.  29 C.F.R. § 1630.2(*l*); see also *Mack v. Great Dane Trailers*, 308 F.3d 776, 782 (7th Cir. 2002) ("So if the condition that is the subject of the employer's belief is not substantially limiting, and the employer does not believe that it is, then there is no violation of the ADA under the 'regarded as' prong of the statute.").  Hawkins claims that Cram regarded her as having a substantial impairment in the major life activity of performing manual tasks.  Pl. Br. at 16.

To survive summary judgment on this theory, Hawkins must offer evidence that Cram believed her impairment permanently prevented or severely restricted her ability to perform activities central to daily life.  See *Tockes v. Air-Land Transport Services, Inc.*, 343 F.3d 895, 896 (7th Cir. 2003) (plaintiff making "regarded as" claim must show that defendant believes he is disabled "*within the meaning of the Act*"); see also *Toyota Motor Manufacturing, Kentucky, Inc. v.*

*Williams*, 534 U.S. 184, 198 (2002) ("We therefore hold that to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives" and that is either "permanent or long term."). The Supreme Court has held that an impairment that interferes with one's ability to garden, go dancing, play with children, or sweep floors does not, as a matter of law, substantially impair activities central to daily living. *Toyota*, 534 U.S. at 202. However, the Court explained that "household chores, bathing, and brushing one's teeth are among the types of manual tasks of central importance to people's daily lives." *Id.*

An employer's subjective perception of an employee's perceived impairment may be established through circumstantial evidence. *Orme v. Swifty Oil Co., Inc.*, 2000 WL 682678, *7 (S.D. Ind. March 28, 2000); see generally *Wright v. Illinois Dep't of Corrections*, 204 F.3d 727, 730-32 (7th Cir. 2000) (applying "regarded as" test and affirming summary judgment for employer); see also *Mack*, 308 F.3d at 783 ("We do not suggest that circumstantial evidence can never be used to show that an employer regarded an employee as disabled; the employer's perception of the employee's impairment is, like its intent to discriminate, a mental state, and direct evidence may be lacking."), citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Cram was aware that Hawkins' impairment was permanent, and that it deprived her of 29 percent of the use of her hand. Pl. Dep. Ex 17. Though she acknowledges that the evidence does not demonstrate that the

impairment actually limits her substantially in the major life activity of performing manual tasks, Hawkins testified that her impairment interferes with her ability to perform a number of household and self-care tasks.  See Pl. Dep. at 58-74.

More important, though, is the evidence of Hawkins' supervisor's perceptions of her impairment.  Hawkins testified that supervisor Kirby was aware of this impairment, repeatedly inquired about Hawkins' limitations in performing household tasks, and repeatedly made comments regarding the effect that Hawkins' impairment must have on her life.  Hawkins Aff. ¶¶ 2-4.  Hawkins also testified that Kirby repeatedly commented to Hawkins and Cram management that there were only "two-and-a-half employees" in her department, meaning that Hawkins' impairment made her only "half" an employee.  Pl. Dep. at 16, 121-22, 138-39.

This evidence speaks directly to Cram's perception of the effect that Hawkins' impairment had on her ability to perform manual tasks central to daily life.  Cf. *Mack*, 308 F.3d at 782 (ruling that plaintiff had not demonstrated that employer regarded him as substantially limited with respect to manual tasks because all evidence pertained only to plaintiff's work restrictions and not his limitations in performing tasks central to daily life).  Drawing all reasonable inferences in the light most favorable to Hawkins, the evidence raises a genuine issue of fact as to whether Cram regarded Hawkins as being substantially limited in the major life activity of performing manual tasks.

B.    *Qualified Individual*

Cram next argues that Hawkins is not a qualified individual with a disability because she is unable to perform what Cram claims is the essential function of multitasking.  Def. Br. at 14-15.  The ADA prohibits discrimination only against a "qualified individual with a disability."  42 U.S.C. § 12112(a).  To present a prima facie case under the ADA, a plaintiff bears the burden of establishing that she "can perform the essential functions of the employment position" that she seeks to keep.  *Weiler v. Household Finance Corp.*, 101 F.3d 519, 524 (7th Cir. 1996), quoting 42 U.S.C. § 12111(8).  The plaintiff must demonstrate that she (1) satisfies prerequisite qualifications, such as appropriate education or experience; and (2) is capable of performing the essential functions of the position with or without accommodation.  *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 911 (7th Cir. 1996).  Cram has not argued that Hawkins did not possess the necessary qualifications or experience for a production position.  At the time of her dismissal, Hawkins had worked for Cram for nearly twenty-four years in multiple departments.  The issue is whether Hawkins was able to perform the essential functions of her position.

Cram argues that Hawkins was unable to meet the requirement for retention that an employee be able to multitask and to work in various departments of the facility.  Hawkins questions whether this requirement is an essential function of the job.  She contends that Cram retained many employees who were not capable of independently performing every task in even their own

-24-

departments, and that some employees were retained who were capable of performing fewer tasks than she.

Cram appears to argue that the court must accept without question an employer's assertions about which tasks constitute essential functions of the positions at the facility. See Def. Br. at 15, quoting *Haga v. Heatcraft Inc.*, 10 F. Supp. 2d 1027, 1032 (C.D. Ill. 1998) ("The employer is entitled to define the position, in terms of its essential scope and the qualifications required to complete the job."). While an employer's definition of the essential functions of a position is an important factor for the court's assessment of whether a plaintiff is "qualified" for ADA purposes, the court should not merely rubber-stamp an employer's assertions about which functions are essential.

The language of the ADA requires that "consideration shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8). This governing statutory language plainly does not authorize, let alone require, blind deference to the employer's judgment. See *Nicholas v. Acuity Lighting Group, Inc.*, 2005 WL 280341, *9 (S.D. Ind. Jan. 4, 2005).

The EEOC regulations further guide the court in evaluating an employer's judgment as to which functions are essential for performance of a job. The regulations provide:

(3) Evidence of whether a particular function is essential includes, but is not limited to:

(i)     The employer's judgment as to which functions are essential;
(ii)    Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii)   The amount of time spent on the job performing the function;
(iv)    The consequences of not requiring the incumbent to perform the function;
(v)     The terms of a collective bargaining agreement;
(vi)    The work experience of past incumbents in the job; and/or
(vii)   The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).  Like the statutory language of the ADA itself, the regulations show that the employer's judgment should be considered, but that courts should not rubber-stamp that judgment.  Such guidance is sound and practical in the context of the ADA.  The ADA requires employers to provide reasonable accommodations to employees under certain circumstances.  See 42 U.S.C. § 12112(b)(5).  In deciding reasonable accommodation issues, a court cannot always accept an employer's assumptions and judgments about the tasks that employees must perform.  See *Vande Zande v. State of Wisconsin Dep't of Administration*, 44 F.3d 538, 542 (7th Cir. 1995).  Otherwise, employers could undermine the ADA by inventing new "essential functions" as *post hoc* rationalizations for unlawful discrimination.

Seventh Circuit decisions demonstrate that an employer's definition of the "essential functions" of a job is not entitled to uncritical or blind deference from the court.  Employers may not simply declare the absence of a disability a job-qualification, nor may they rely on pretextual qualifications not actually put to

use.  In *DePaoli v. Abbott Laboratories*, 140 F.3d 668 (7th Cir. 1998), the appellate court affirmed summary judgment for an employer, finding that a factory worker with repetitive motion injuries was not able to perform the essential functions of her job, even with accommodation, and there were no vacant positions to which she could have transferred.  On the issue of essential functions of the job, the Seventh Circuit wrote:

> DePaoli's case ultimately fails because she must do more than establish that she is disabled.  She must also show that she was a "qualified" individual with a disability, meaning that she could perform the job either with or without reasonable accommodations.  See 42 U.S.C. § 12112(a); 42 U.S.C. § 12111(8).  An employer would not, of course, be entitled to announce that the lack of any ADA disability was a "qualification" for a job, nor would it be entitled to create pretextual qualifications.  *Cf. Miller v. Illinois Dept. of Corrections*, 107 F.3d 483, 485 (7th Cir. 1997) (qualifications must be established for "valid" reason).  However, because there are no allegations here that Abbott has engaged in such improper conduct, the statute directs us to focus on the employee's ability to perform the "essential functions" of the position.  See 42 U.S.C. § 12111(8).  Although *we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions*, see *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir. 1995) and 29 C.F.R. Pt. 1630, App. § 1630.2(n), we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job.  See *E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 147 (1st Cir. 1997) (inquiry into essential functions is not intended to second-guess employer's business judgment); *Riel v. Electronic Data Systems, Corp.*, 99 F.3d 678, 682 (5th Cir. 1996) ("substantial deference" to be given to employer's written descriptions of "essential functions"); 42 U.S.C. § 12111(8) (consideration should be given to employer's written description of "essential functions"); 29 C.F.R. Pt. 1630, App. § 1630.2(n).  *Cf. Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 678-79 (7th Cir. 1998).

*DePaoli*, 140 F.3d at 674 (emphasis added).  *DePaoli* makes clear that although employers, as a practical matter, may often be in the best position to define the

essential functions of the positions they employ, *Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 676 (7th Cir. 1998), courts should nonetheless consider whether the employer's proffered "essential functions" are actually essential. *DePaoli*, 140 F.3d at 674; accord, *Basith v. Cook County*, 241 F.3d 919, 928, 929 (7th Cir. 2001) ("Cook County is allowed to determine the job responsibilities of its pharmacy technicians, and it is not this court's duty to second-guess that judgment so long as the employer's reasons are not pretextual."). The precedents cited in *DePaoli* are also instructive on this point.

Most instructive here is *Riel*, in which the Fifth Circuit held that the employer's judgment about which functions were essential did *not* entitle the employer to summary judgment. The plaintiff Riel was an engineer who suffered from a renal condition that caused fatigue. His illness sometimes caused him to miss interim or "milestone" deadlines on his projects, but the parties agreed that he had never missed a final deadline on a project. The decisive issue was whether meeting the interim milestone deadlines was an essential function of the engineer's job, as the employer claimed. The plaintiff responded with evidence showing that other engineers missed milestone deadlines, which were often adjusted when projects turned out to be more challenging than expected. Also, the written and oral job descriptions had not listed meeting such milestone deadlines as an essential function. *Riel*, 99 F.3d at 682-83. The Fifth Circuit paid close attention to the language of the regulation, with its multiple factors, and found that the district court erred in deciding the issue in favor of the employer

on summary judgment.  *Id.*  Although the Fifth Circuit introduced the phrase "substantial deference" to paraphrase the statutory phrase "consideration shall be given to the employer's judgment" in 42 U.S.C. § 12111(8), it actually applied the law in such a way that conflicting evidence from the employee about the way the job was actually performed could support a contrary conclusion.  *Id.* at 683.

*DePaoli* also relied upon *EEOC v. Amego, Inc.*, in which the First Circuit borrowed the "second guess" phrase from the EEOC's Interpretive Guidance for employers, 29 C.F.R. Part 1630, App.  The Interpretive Guidance discusses the definition of "essential function" in § 1630.2(n) of the regulations:

> It is important to note that the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor to require employers to lower such standards.  (See § 1630.10 Qualification Standards, Tests and Other Selection Criteria).  If an employer requires its typists to be able to accurately type 75 words per minute, it will not be called upon to explain why an inaccurate work product, or a typing speed of 65 words per minute, would not be adequate.  Similarly, if a hotel requires its service workers to thoroughly clean 16 rooms per day, it will not have to explain why it requires thorough cleaning, or why it chose a 16 room rather than a 10 room requirement.  *However, if an employer does require accurate 75 word per minute typing or the thorough cleaning of 16 rooms, it will have to show that it actually imposes such requirements on its employees in fact, and not simply on paper.*

29 C.F.R. Pt. 1630, App. (emphasis added).  This interpretive guidance leaves room for a plaintiff like Hawkins to come forward with evidence contradicting the employer's claim as to whether a particular function is essential, based in part on the way the job is actually performed.

Similarly in *Milton*, the Tenth Circuit recognized that the employer's judgment was entitled to consideration but would not necessarily be decisive. In the absence of contradictory evidence, the employer's judgment turned out to be in fact decisive, but the court wrote: "Although ordinarily a fact question to be decided on a case-by-case basis, see 29 C.F.R. Pt. 1630, App. § 1630.2(n), plaintiffs have presented no evidence to rebut the conclusion that speed is essential to the selector job." 53 F.3d at 1124. For present purposes, the most important point in *Milton* is the reminder that whether a function is essential is ordinarily a fact question to be decided on a case-by-case basis.

Another Seventh Circuit case regarding qualifications required for a position is also instructive. In *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626 (7th Cir. 1998), the court reversed summary judgment in favor of the employer in part because the district court had too uncritically accepted the employer's claim that the plaintiff did not possess the qualifications required for the jobs to which he sought transfer. *Baert*, 149 F.3d at 631-32, 634. The plaintiff Baert, a truck driver with insulin-dependent diabetes, was no longer able to meet the qualifications of his job. He sought to be transferred to another position for which he was qualified. *Id.* at 628. Baert claimed he was qualified to work as a "Driver Helper." *Id.* at 631. The employer claimed that the Driver Helper position required a commercial trucking license, which Baert's diabetes prevented him from holding. *Id.* However, the employer admitted that temporary Driver Helpers were not always required to hold such a license, and Baert testified that Driver Helpers did not

always drive on trips.  The Seventh Circuit therefore found a genuine issue of fact as to whether the license was a true qualification.  *Id.* at 632.  An employer "may not obtain summary judgment by declaring it has a policy" when the employee could present evidence that the policy was followed only "selectively."  *Id.*

The evidence now before the court presents this sort of genuine issue of fact. Cram claims that the goal of the reduction in force was to downsize its workforce to a "core group of employees who had a high level of abilities to work in different areas and to multitask."  Def. Br. at 4, 20; Thomas Dep. at 10, 12.  Accordingly, Cram claims that Hawkins was dismissed because "she could not work in different departments and multitask consistent with downsizing objectives."  Def. Br. at 20; Janowiecki Aff. ¶ 8.  Cram acknowledges that Hawkins is able to perform multiple tasks in various departments at the facility.  Def. Br. at 3-4.  While Cram repeatedly emphasizes that its primary goal in downsizing was to retain only those who were able to "multitask," the precise meaning of the term remains unclear. The term could mean that one is able to perform every task in every department. The term could also signify the ability to perform some tasks in every department. The evidence presented does not establish the meaning of the term to the extent that the court may, as a matter of law, determine whether Hawkins is able to perform this "essential function."

More fundamentally, the evidence also raises a genuine issue of fact as to whether Cram actually considers the ability to multitask an essential function of

production work at the facility.  Cram's repeated emphasis on Hawkins' testimony that her impairment rendered her unable to do "everything" in the facility suggests that because Hawkins cannot perform *every* task a production worker may perform, she cannot perform *any* job as a production worker.  Both Thomas and Eubanks testified that, after the 2003 downsizing, employees commonly rotate among departments to suit production needs.  Thomas Dep. at 34-39; Eubanks at 22.  However, the evidence presented by both parties raises an issue as to whether Hawkins was able to perform more tasks than some retained employees, and whether some retained employees were also unable to perform all of the tasks in their respective departments.  See Kirby Aff. Ex. 1; Eubanks Dep. at 20-21, 40-41; Eubanks Dep. Ex 5; Def. Br. 3-4.

Cases cited by Cram demonstrate that an employer may require that employees have the capacity to rotate through a number of jobs in order to respond to employee illness, changing customer demands, or other reasons.  But such cases nonetheless require that this demand be genuine.  See *England v. ENBI Indiana, Inc.*, 102 F. Supp. 2d 1002, 1012 (S.D. Ind. 2000) ("So long as the employer's requirement serves a legitimate business purpose, we will not second guess the employer's decision that the employees rotate through the various tasks."); see, *e.g.*, *Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 700 (7th Cir. 1998), quoting *Miller v. Illinois Department of Corrections*, 107 F.3d 483, 485 (7th Cir. 1997) (holding that employer's requirement that an employee be able to perform multiple tasks will be considered an essential function where the

employer has a "legitimate reason" for the requirement). Because the evidence raises genuine issues of fact regarding (1) what the ability to "multitask" actually requires, and (2) whether Cram actually considered the ability to multitask to a degree beyond Hawkins' ability an essential function of a retained production position, the court cannot find that Hawkins is not a "qualified individual" as a matter of law.

C.   *Discrimination Because of a Disability*

To survive summary judgment on her ADA claim, Hawkins must also advance sufficient evidence to raise a genuine issue of fact as to whether she was terminated by Cram "because of" her disability. 42 U.S.C. § 12112(a); *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 670 (7th Cir. 2000). An employer is permitted to dismiss an employee if, because of her disability, she is unable to perform the essential functions of her job, even with reasonable accommodations. *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1196 (7th Cir. 1997). However, "[e]ven if the employer has a compelling reason wholly unrelated to the disabilities of any of its employees to reduce the size of its work force, this does not entitle it to use the occasion as a convenient opportunity to get rid of disabled workers." *Id.* at 1195. Hawkins has presented evidence sufficient to create an issue of fact as to whether she was dismissed because of her disability.

The relevant facts and arguments here are similar to those applicable to Hawkins' ADEA claim. Cram claims that the objective of the RIF was to "create

a core group of employees who had the ability to work in different areas and to multitask," Def. Br. at 4, 14, and that Hawkins was dismissed because she "could not work in different departments and multitask consistent with Cram's downsizing objectives." Janowiecki Aff. ¶ 8.  To support this claim, Cram explains that Hawkins' impairment prevented her from being able to multitask effectively. Cram points out that Hawkins was evaluated by supervisor Kirby as being unable to perform all of the tasks in her department, and that no one requested that Hawkins be moved to any other department during the management team meeting.  Kirby Aff. ¶¶ 5-8; Kirby Aff. Ex. 1; Eubanks Dep. at 23.  Cram also claims that "none of the employees retained had physical impairments that would keep them from performing all the tasks in production." Def. Br. at 6.  Testimony from Thomas also indicates that it is common for Cram production employees to work in different departments from day to day.  See Thomas Dep. at 35-39.

However, evidence also indicates that at the time of the downsizing, Hawkins was able to perform more tasks, particularly in the FBG Department, than at least two retained employees.  See Def. Br. at 3; Kirby Dep. Ex 1; Eubanks Dep. Ex 5.  Eubanks, who is also Hawkins' son-in-law and former supervisor, requested that Hawkins be transferred to the FBG Department.  Eubanks Dep. at 6-7, 24-25; Thomas Dep. at 18-20; Def. Br. at 6.  Eubanks testified that even some retained employees have not "been able to do every job we give them." Eubanks Dep. at 41.  Further, Hawkins testified that Kirby, who evaluated Hawkins' ability and recommended to the management team that she be

dismissed, repeatedly referred to Hawkins around the facility as only half an employee. Pl. Dep. at 121-22, 138-39. Hawkins also testified that she was told by Thomas that her dismissal "had nothing to do" with either cross-training or seniority. Pl. Dep. at 111.

This conflicting evidence supports conflicting inferences about Cram's reasons, and the decision must be made by a finder of fact. See *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."); accord, *Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). In a trial, the fact that Eubanks, who sought to save Hawkins' job, is also her son-in-law may produce some interesting evidence and argument, but that fact plays no role in the summary judgment analysis. The evidence before the court demonstrates genuine issues of material fact remaining as to whether Cram impermissibly discriminated against Hawkins because it regarded her as disabled.

*Conclusion*

Because the evidence now before the court demonstrates genuine issues of fact material to Hawkins' claims both under the ADA and the ADEA, defendant's motion for summary judgment (Docket No. 34) is denied.

So ordered.


Date: October 28, 2005

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana


Copies to:

Stuart R. Buttrick
BAKER & DANIELS
srbuttri@bakerd.com

Kenneth E. Lauter
HASKIN LAUTER LARUE & GIBBONS
klauter@hlllaw.com

Roberta Sabin Recker
BAKER & DANIELS
rsrecker@bakerd.com

Christopher S. Wolcott
HASKIN LAUTER LARUE & GIBBONS
cwolcott@hlllaw.com